| | |
|---|---|
| REGINALD WILSON, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>)<br>MICHAEL CUNN, et al., )<br>)<br>)<br>Defendants. )<br>_____ ) | **ORDER** |

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment. [Doc. 25].

**I.    BACKGROUND**

    **A.    Procedural Background**

Pro se Plaintiff Reginald Wilson, a North Carolina inmate currently incarcerated at Neuse Correctional Institution in Goldsboro, North Carolina, filed this action on June 6, 2018, pursuant to 42 U.S.C. § 1983. Plaintiff named as Defendants Michael Cunn,[1] Joseph Gorman, and Andrew Brewer, all identified as officers with the Buncombe County Sheriff's Office at all relevant times. Plaintiff also named Buncombe County as a Defendant. Plaintiff alleges that, on February 15, 2018, Defendants used excessive force against Plaintiff while he was a pre-trial detainee at Buncombe County Jail. Plaintiff also brought claims for "assault" and "aggravated assault" based on the same conduct. Plaintiff seeks compensatory damages and injunctive relief, including "free health care for life" and that Defendants be "retrained or fired." [Doc. 1 at 5]. The Plaintiff's

---

[1] Plaintiff incorrectly identified Defendant Michael Corn as "Michael Cunn" in his Complaint. Defendant Corn is hereinafter referred to as "Defendant Corn."

complaint survived initial review under 28 U.S.C. § 1915(e)(2). [Doc. 11].

On April 8, 2018, Defendants filed the pending summary judgment motion. [Doc. 25]. On May 3, 2018, this Court entered an Order pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), granting Plaintiff fourteen days to respond to the summary judgment motion. [Doc. 27]. On May 9, 2019, Plaintiff filed his own Affidavit in response to Defendants' motion. [Doc. 28]. On October 15, 2019, well after the expiration of the 14-day deadline to respond to Defendants' summary judgment motion, Plaintiff filed a document captioned, "Motion To Denied Defendants Motion for Summary Judgment." Doc. 31].

### B. Factual Background

#### 1. Defendants' Summary Judgment Materials

In support of the summary judgment motion, Defendants rely on incident reports of the Defendants and two other officers involved in the alleged use of force at issue, Plaintiff's medical records, other prison records and policies, as well as the Affidavits of Captain Anthony Gould, Defendant Gorman, Defendant Brewer, Defendant Corn, LPN April Stroupe, and Nurse Tonia Bartlett. [See Docs. 25-2 through 25-7]. Defendants' forecast of evidence shows the following:

Plaintiff was committed to the Buncombe County Detention Facility (the "Jail") early in the morning on February 15, 2018, by a magistrate judge, to await disposition of various charges. [Doc. 25-2 at ¶ 6: Affidavit of Captain Anthony Gould]. The magistrate instructed the Jail to produce Plaintiff in Superior Court at 9:00 a.m. later that same morning. [Id. at ¶ 7]. The magistrate also committed Plaintiff to the Jail. [Id.]. Plaintiff was taken to Superior Court, as ordered, where Plaintiff's conditions of release were unchanged. [Id. at ¶ 8].

After Plaintiff's court appearance, Defendant Gorman escorted Plaintiff, along with other inmates, back to the Jail. [Id. at ¶ 9; Doc. 25-3 at ¶ 6: Affidavit of Joseph Gorman]. Plaintiff was

not handcuffed or shackled at this time. [Doc. 25-3 at ¶ 7]. When Defendant Gorman arrived back at the Jail with Plaintiff, he asked Plaintiff where Plaintiff had been held before Plaintiff went to court. Plaintiff refused to answer. [Id. at ¶ 8]. Plaintiff was irritated and wanted to talk about his criminal charges. [Id. at ¶ 9]. Defendant Gorman tried to "de-escalate the Plaintiff by talking to him in a courteous manner." [Id. at ¶ 10; Doc. 25-4 at ¶ 5: Affidavit of Andrew Brewer]. Plaintiff, however, continued to escalate and became argumentative, more agitated, and uncooperative. [Id. at ¶ 11; Doc. 25-4 at ¶ 6]. Defendant Gorman asked Plaintiff to go to a nearby unoccupied jail cell, cell 19. [Id. at ¶ 12; Doc. 25-4 at ¶ 7]. Plaintiff, who was still not handcuffed or shackled, refused to comply with Defendant Gorman's order. [Id. at ¶ 13; Doc. 25-4 at ¶ 8]. Defendant Gorman, therefore, grabbed Plaintiff's right arm to escort him to cell 19. [Id. at ¶ 14; Doc. 25-4 at ¶ 9]. Rather than cooperating and entering cell 19, Plaintiff attempted to "run towards" Defendant Gorman. [Id. at ¶ 15; see Doc. 25-4 at ¶ 9].

At this time, Deputy Mark Whitted, who was nearby, intervened to assist Defendant Gorman by grabbing Plaintiff's left arm. [Id. at ¶ 16; Doc. 25-4 at ¶ 10]. Plaintiff continued to actively resist Defendant Gorman and Deputy Whitted as they attempted to escort Plaintiff into cell 19, Plaintiff refusing to walk under his own will. [Id. at ¶ 17; Doc. 25-4 at ¶ 11]. Defendant Brewer then grabbed Plaintiff's legs and, together, the three officers were able to carry Plaintiff into cell 19 and to lower Plaintiff to the ground in a controlled manner without injury. [Id. at ¶ 18; Doc. 25-4 at ¶¶ 12-13]. In the course of carrying Plaintiff to cell 19 and because of Plaintiff's continued, active resistance, Plaintiff's pants fell down until they were around his ankles. [Doc. 25-4 at 5]. Plaintiff, who is strong and in good physical shape, was still unhandcuffed, unshackled, actively resisting, and combative. [Doc. 25-2 at ¶ 19]. Because Plaintiff continued to actively resist and remained combative, and in order to protect everyone involved, it was necessary to place

handcuffs on Plaintiff before the deputies left cell 19. [Id. at ¶ 20]. Defendant Gorman ordered Plaintiff to lay on his stomach, which Plaintiff refused. [Doc. 25-3 at 6]. Plaintiff continued to actively resist, was combative, and appeared intent on assaulting deputies if he were able. [Doc. 25-2 at ¶ 21]. Plaintiff refused clear verbal commands to stop resisting and to lay on his stomach and instead attempted to turn towards the deputies in an aggressive manner. [Id. at ¶ 14]. Defendant Gorman then used a mandibular angle pressure-point technique to gain compliance. [Doc. 25-3 at 6]. Believing that the officers involved were in imminent danger of being struck with a fist or an elbow, Defendant Brewer then deployed his TASER and delivered a single, five second "dry stun" to Plaintiff's right buttock. [Id. at ¶ 21; Doc. 25-4 at ¶¶ 15-16]. Defendant Corn, who was nearby in the Jail's booking area conducting pat down searches on two newly arrived inmates, entered cell 19 and handed Defendant Brewer his handcuffs to use on Plaintiff. [Doc. 25-5 at ¶ 6: Affidavit of Michael Corn]. Defendant Corn then took control of Plaintiff's feet. [Id. at ¶ 8]. Plaintiff was quickly handcuffed, and the deputies involved exited cell 19 without further incident. [Doc. 25-3 at ¶ 22; Doc. 25-4 at ¶ 17; Doc. 25-5 at ¶ 7]. A few minutes later, Defendant Corn and another deputy removed Plaintiff's handcuffs through the cell door without incident. [Id. at ¶ 22; Doc. 25-5 at ¶ 8]. A nurse was immediately called to asses Plaintiff. [Id. at ¶ 22; Doc. 25-4 at ¶ 19; Doc. 25-5 at ¶ 9]. At no time were Plaintiff's legs restrained, shackled, or connected in any way to Plaintiff's hands. [Id. at ¶ 24; Doc. 25-4 at ¶ 20; Doc. 25-5 at ¶ 10].

Nurse Stroupe examined Plaintiff shortly after the deputies placed him in cell 19. [Doc. 25-5 at ¶ 5: Affidavit of LPN April Stroupe]. Nurse Stroupe determined that Plaintiff was not injured by the deputies' use of force and noted this in Plaintiff's medical record:

> Call to Booking to assess altercation with officers. [Plaintiff] stated he needed to go to hospital for an xray of his arm because one of them stepped on him, shortly thereafter he moved his arm in all ranges of motion. He then told me that he has broken his back and

4

> he can[']t move and he needs to go to the hospital. I stated to him that he would not be standing there talking to me if he had broken his back. He became very argumentative[ ] and would not let me finish any statement. He wanted my name and title so he could sue me. He wanted another nurse to assess him. I made the patient aware that he would be seen by the intake nurse. When the officer shut the cell door the inmate proceeded to beat and bang on the door with both hands and feet.

[Doc. 25-7 at 4].

The following day Plaintiff's intake assessment was performed by Nurse Yvonne Farnell. Nurse Farnell noted in Plaintiff's medical record that Plaintiff, "states [he] was in an altercation with police, and has issues with moving his left arm, although he is moving arm freely without facial grimace or voicing pain." [Id. at 5]. No other medical issues were reported at the intake assessment, and Plaintiff was advised how to access healthcare at the Jail. [Id. at 5-11]. On May 23, 2018, another intake assessment was performed on Plaintiff, as Plaintiff had returned to the confinement of the Jail, this time by Nurse B. Garth. No medical issues were reported at this time. [Id. at 12-16]. The record contains a notation for Plaintiff's special diet of, "NO MEAT, Religious reason." [Id. at 15].

During Plaintiff's confinement at the Jail, he had free access to file grievances and to communicate with Jail staff. [Doc. 25-2 at ¶ 16]. Plaintiff filed no grievances regarding any of the allegations of his Complaint. [Id. at ¶ 17]. As noted, Plaintiff returned to the Jail on or about May 23, 2018. [See Doc. 25-7 at 12]. On June 17, 2018, while still in the Jail, Plaintiff filed a grievance, claiming money was wrongly taken from his prison account for damage to window caulking in his cell that Plaintiff was not responsible for and without a charge being filed against him before the money was withdrawn. [Doc. 25-2 at 29]. The grievance makes no mention of any of the allegations of his Complaint in this case. [Id. at 29; Doc. 25-2 at ¶ 19]. In response to Plaintiff's grievance, the Jail restored the disputed money to Plaintiff's prison account. [Id. at 31].

Plaintiff has made no showing in the instant case that he exhausted his administrative remedies.

## 2. Plaintiff's Summary Judgment Materials

In opposition to Defendants' summary judgment motion, Plaintiff has submitted his own Affidavit and a document which is essentially a memorandum in response to Defendants' summary motion.² [Docs. 28, 31]. Plaintiff's forecast of evidence, presented in his Affidavit, shows, in pertinent part, the following:

When Plaintiff was being returned to the Jail after his court appearance, and in the central booking area where there is video surveillance, Defendant Gorman ask Plaintiff where Plaintiff was being housed. [Doc. 28 at 1: Affidavit of Reginald Wilson]. Plaintiff replied that "[h]e was not housed in any one of the holding cells because the magistrate instructed the jail to produce the plaintiff in Superior court at 9:00 a.m." [Id.]. Defendant Gorman responded, "Are you tring [*sic*] to make me feel small or something[?]." Plaintiff replied, "[h]ow can I make you feel small, unless you already feel some type of way[?]." [Id.]. Plaintiff was not hostile, yelling, or using profanity. Plaintiff did not threaten Defendant Gorman or anyone else. [Id.].

Defendant Gorman then grabbed Plaintiff's arm and tried to restrain Plaintiff "for no reason." [Id.]. Plaintiff repeatedly asked Defendant Gorman, "what did I do[?]." [Id. at 2]. "[O]ther officers came running out to assist [Defendant] Gorman with restraining Plaintiff, bending and twisting plaintiff [*sic*] arms." [Id.]. Defendant Brewer grabbed Plaintiff's feet and pulled down his pants and "under clothes" to Plaintiff's ankles, "leaving a bruise" on Plaintiff's right hip. [Id.]. Plaintiff repeatedly shouted, "Are you gay or something[?]." Plaintiff was then carried to cell 19 and "placed on the floor." [Id.]. Moments later, Plaintiff felt a hand on his shoulder and handcuffs were placed on Plaintiff's hands and feet. [Id.]. Plaintiff was then tasered

---

² Because Plaintiff filed this response more than four months after the response deadline (and because it makes no difference in the outcome of these proceedings, in any event), the Court will not consider it.

four times on the right side of his buttock, "[w]hile officers were pressing their knees and foot in my back." [Id.]. After the fourth taser application, Defendants took the handcuffs off Plaintiff's hands and feet and exited cell 19. [Id. at 2-3].

Plaintiff then started yelling for a nurse to come examine him. [Id. at 3]. Plaintiff also shouted that he needed a grievance form and asked Defendants for their names for the form. Defendants never gave Plaintiff their names. [Id.]. One officer told Plaintiff that the grievance must be done at the Kiosk machine. [Id.]. Nurse April Stroupe "finally showed up" and Plaintiff complained that his back was broken and that his "body hurts really bad." After Nurse Stroupe told Plaintiff, "you look fine to me," Plaintiff requested another nurse. Nurse Stroupe responded that Plaintiff would be seen by the intake nurse. Plaintiff then asked "Nurse April" for her full name "for the grievance that plaintiff was preparing to write and to sue for negligent [*sic*]." [Id.]. Nurse Stroupe walked away. [Id.]. Plaintiff "continued to suffer margrane [*sic*], headaches, and general pain through out the body and Nurse April and Nurse Bartlett refused to provide adequate pain medication for plaintiff." [Id. at 3-4]. "In addition, plaintiff was unable to move or function properly for days after not receiving care…." [Id. at 4]. Plaintiff's big toe had a "numb feeling" and his legs, arm and back were "in so much pain." [Id.].

Two days later, when Plaintiff had access to the Kiosk machine, he made multiple requests for medical attention "because he was in so much pain." [Id.]. Plaintiff also "requested a grievance form and a diet change for religious purpose." [Id. at 4-5]. Plaintiff received no medical attention and no response to his request for a grievance form. [Id. at 5]. Seven months later, when Plaintiff was again incarcerated, he saw a doctor due to "on and off" leg and back pain. [Id.]. The doctor told Plaintiff that he had an issue with a blood vessel in his right leg and a "circulatory problem," which "would be the cause of his back and leg pain." [Id.].

7

Neither party submitted any video footage of any alleged event in this matter. Further, there is no evidence in the record of any discovery dispute between the parties regarding the production of any video footage.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477

U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

### III.    DISCUSSION

The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust his administrative remedies before filing a section 1983 action. 42 U.S.C. § 1997e(a). The PLRA provides, in pertinent part: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Id. In Porter v. Nussle, 534 U.S. 516 (2002), the Supreme Court held that the PLRA's exhaustion requirement applies to all inmate suits about prison life. The Court ruled that "exhaustion in cases covered by § 1997e(a) is now mandatory." Id. at 524 (citation omitted). The Porter Court stressed that, under the PLRA, exhaustion must take place before the commencement of the civil action in order to further the efficient administration of justice. Id.

In Woodford v. Ngo, 548 U.S. 81 (2006), the Supreme Court held that the PLRA exhaustion requirement requires "proper" exhaustion: "Administrative law . . . requir[es] proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).'" Id. at 90 (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)). In Jones v. Bock, 549 U.S. 199 (2007), the Supreme Court stated: "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." Id. at 211 (citing Porter, 534 U.S. at 524).

Under the PLRA, however, "[a]n inmate … must exhaust available remedies, but need not exhaust unavailable ones." Ross v. Blake, 136 S. Ct. 1850 (2016). "[T]he ordinary meaning of the word 'available' is 'capable of use for the accomplishment of a purpose,' and that which 'is

9

accessible or may be obtained.'" Id. at 1858-59 (quoting Booth v. Churner, 532 U.S. 731, 737-38, 121 S. Ct. 1819 (2001) (internal quotation omitted)). "Accordingly, an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" Id. at 1859 (quoting Booth, 532 U.S. at 738, 121 S. Ct. 1819).

Here, Defendants forecasted evidence showing that Plaintiff had full access to grievance procedures during Plaintiff's confinement in February 2018 and again during his confinement that began in May 2018. Defendants have also shown that, in June 2018, Plaintiff was provided at least one grievance form and successfully employed the grievance procedure to dispute funds that were taken from his prison account for damage to his cell window. In response, Plaintiff has forecasted evidence only that he did not have access to the grievance procedure during the two days immediately following the incident that is the subject of his Complaint. He forecasted no evidence that he made any other attempts, either during his February 2018 Jail stay or during his temporary release, to file a grievance.

Because the forecast of evidence shows that the grievance procedures were available to Plaintiff and that Plaintiff failed to exhaust his administrative remedies before commencing this lawsuit, the Court must grant summary judgment for Defendants on Plaintiff's § 1983 claim. Further, in light of the dismissal of Plaintiff's § 1983 claim, the Court will decline to exercise supplemental jurisdiction over Plaintiff's state law assault claims and will dismiss those claims as well. 28 U.S.C. § 1367(c)(3).

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1. Defendant's Motion for Summary Judgment [Doc. 25] is **GRANTED**, and this action is dismissed with prejudice.

2. The Clerk is respectfully instructed to terminate this action.

Signed: November 25, 2019

Frank D. Whitney
Chief United States District Judge